**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| WARNER CHILCOTT COMPANY, LLC and HOFFMAN-LA ROCHE INC., <br><br> Plaintiffs, <br><br> v. <br><br> TEVA PHARMACEUTICALS USA, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) C.A. No. 08-627-LPS <br><br> (CONSOLIDATED) |

**NOTICE OF DEPOSITION OF WARNER CHILCOTT COMPANY, LLC**
**PURSUANT TO FED. R. CIV. P. 30(b)(6)**

PLEASE TAKE NOTICE THAT, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") will take the deposition upon oral examination of Warner Chilcott Company, LLC ("Warner Chilcott"). The deposition will take place at a location and time mutually agreeable to counsel and will continue from day to day until completed. The deposition will be taken before a notary public or other officer duly authorized to administer oaths and take testimony, and will be recorded by stenographic means and may be audiotaped and/or videotaped.

PLEASE TAKE FURTHER NOTICE THAT, pursuant to Rule 30(b)(6), Warner Chilcott is required to designate and produce one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf with respect to the matters set forth in the attached Schedule A. The person(s) so designated shall be required to testify as to each of those matters known or reasonably available to plaintiffs.

| | |
|---|---|
| DATED: July 11, 2011 | **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br><br>*/s/ Karen L. Pascale*<br>_____<br>Karen L. Pascale (No. 2903) [kpascale@ycst.com]<br>Karen E. Keller (No. 4489) [kkeller@ycst.com]<br>The Brandywine Building<br>1000 West St., 17th Floor<br>P.O. Box 391<br>Wilmington, Delaware 19899-0391<br>302-571-6600<br><br>*Attorneys for Defendant*<br>*Teva Pharmaceuticals USA, Inc.* |
| OF COUNSEL:<br>James Galbraith<br>Antony Pfeffer<br>Peter L. Giunta<br>Vincent J. Rubino<br>**KENYON & KENYON LLP**<br>One Broadway<br>New York, NY  10004<br>(212) 425-7200 | |

## SCHEDULE A

## DEFINITIONS

Teva USA hereby incorporates by reference the definitions and instructions set forth in Teva USA's First Set of Requests for Production of Documents and Things to the Proctor & Gamble Company (Nos. 1-92), the definitions and instructions set forth in Teva USA's Second Set of Requests for Production of Documents and Things to the Proctor & Gamble Company (Nos. 93-112), the definitions and instructions set forth in Teva USA's First Set of Interrogatories to Plaintiffs (Nos.1-6), the definitions and instructions set forth in Teva USA's Second Set of Interrogatories to Plaintiffs (Nos.7-13), the definitions and instructions set forth in Teva USA's Third Set of Interrogatories to Plaintiffs (Nos.14-20), and the definitions and instructions set forth in Teva USA's Third Set of Interrogatories to Plaintiffs (Nos. 21-29).

"Plaintiffs" means plaintiffs, Warner Chilcott Company, LLC, The Procter & Gamble Company, and Hoffman-La Roche, Inc., and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all officers, directors, employees, agents, attorneys, representatives, partners, affiliates, and all other persons or entities acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

## MATTERS UPON WHICH EXAMINATION IS REQUESTED

1. The conception and reduction to practice (actual and constructive) of the alleged invention(s) claimed in each of the asserted claims of the patents in suit, including, but not limited to, the dates on which each occurred, the individuals involved, any witnesses thereto, the surrounding circumstances, the first disclosure to a person other than the named inventors, the first written description, and an identification of any laboratory notebook pages or other documents reflecting the foregoing.

2. The conception and reduction to practice of the subject matter of U.S. Patent Applications 10/897,897, 12/077,623, and 12/163,278.

3. P&G's position as to entitlement to priority between the named inventors on the patents in suit and the named inventors on U.S. Patent Applications 10/897,897, 12/077,623, and 12/163,278 for claims to a 150 mg single dose of risedronate once-a-month.

4. The factual bases for Warner Chilcott's contention or belief that a nexus exists between the asserted claims of the patents in suit and any alleged secondary considerations of nonobviousness, such as (1) commercial success of any claimed subject matter, including an explanation of the nexus between any alleged commercial success and the claimed invention; (2) long felt but unresolved need or potential market demand of any claimed subject matter; (3) unexpected properties or results of any claimed subject matter; (4) prior failure of others to solve the problem addressed by the claimed invention; (5) copying by others of the alleged inventions; (6) skepticism by others skilled in the art regarding any claimed subject matter; (7) praise for the alleged inventions; (8) commercial acquiescence of any claimed subject matter; and (9) presence or lack of simultaneous development by others of any claimed

subject matter, including but not limited to identification of facts, documents, opinions, samples, investigations, tests, measurements, and analyses that support plaintiffs' contention or belief, and the identification of documents reflecting or demonstrating the foregoing.

5. The applicability of the secondary considerations of nonobviousness to the '513, '634 and '938 patents, including without limitation the identification of facts, documents, opinions, samples, investigations, tests, measurements, and analyses bearing on the secondary considerations and the identification of documents reflecting or demonstrating the foregoing.

6. Any testing of the subject matter of the patents in suit performed prior to filing each of the applications in the chains that led to the patents in suit, including, but not limited to, a description of the testing and results, the dates such tests were performed, the individuals involved, and an identification of all documents reflecting such testing.

7. Any licensing agreements between plaintiffs concerning patents on bisphosphonates used to treat osteoporosis, including, but not limited to, the dates of any such agreements, the individuals involved, the reasons each party entered into the agreement, the perceived benefit of each agreement to each plaintiff that entered into the agreement, and an identification of all documents reflecting the foregoing.

8. The state of the art in the area of bisphosphonate dosage forms in 1997.

9. The state of the art in the area of osteoporosis treatment in 2002.

10. The research and development by P&G of a monthly dosage of risedronate.

11. The purported advantages and any disadvantages of a monthly dose of 150 mg risedronic acid compared to dosing of different amounts at other intervals, *e.g.* daily and weekly.

12. The research and development of bisphosphonate osteoporosis therapies at intervals less frequent than weekly dosing.

13. The preparation, filing, and prosecution of the applications in the chains that led to the patents in suit and any related applications and counterpart(s), or actual or contemplated interferences, including all domestic and foreign patent applications on which those applications rely for priority.

14. The patents in suit, including, but not limited to, any preparations, examples, tests, and tables disclosed in the specifications.

15. All U.S. or foreign patent applications that plaintiffs are aware of that pertain to monthly dosages of risedronic acid and/or its use in the treatment of osteoporosis, and including, but not limited to, an identification of each such application, all internal or external communications concerning such applications, any notes made by any employee of plaintiffs about any of the applications, and the circumstances under which plaintiffs became aware of each application.

16. Any communications (whether written or oral) between P&G and Roche, whether direct or to counsel, concerning the patents in suit or any other patents or patent applications related to risedronate, including, but not limited to, the dates of each such communication, the individuals involved, the substance of each such communication, and the identification of all documents reflecting the foregoing.

17. Any actual or proposed agreements to which Warner Chilcott is a party or has contemplated being a party concerning (i) the patents in suit, (ii) United States and foreign patents and patent applications that claim risedronic acid or its medicinal uses, and/or (iii) the rights to make, use, import, sell, or offer for sale risedronic acid-containing products; including, but not limited to, the dates of each such agreement, the individuals involved, the surrounding circumstances, the terms of each such agreement, the negotiation of each such agreement, and all communications concerning each such agreement.

18. Warner Chilcott's and P&G's monthly sales by dollar and unit of risedronate-containing products since the dates those products were launched.

19. The marketing, advertising, promotion, and sales of risedronate 150 mg, including, but not limited to, launch plans, marketing plans, market research, market share, competitive analysis, promotional materials, sales training materials, detailing of physicians, and the funding of those items.

20. Communications between plaintiffs and the FDA concerning monthly risedronic acid-containing products, and any internal memoranda or discussions regarding the same.

21. Any alleged unexpected results of the claimed subject matter, including, but not limited to, an identification of the tests, data or other documents that plaintiffs claims demonstrate such unexpected results.

22. Any comparisons, tests, studies or data regarding the efficacy in treatment of diseases associated with abnormal calcium or phosphate metabolism, the toxicity, or activity of risedronate as compared to any other bisphosphonate.

23. The first public disclosure of the subject matter claimed in each of the asserted claims of the patents in suit, including, but not limited to, the date of such disclosure, the circumstances surrounding such disclosure, the individuals involved, and the identification of the documents concerning the foregoing.

24. From the date P&G launched its Actonel® 150 mg product in the United States to the present, the revenue (including but not limited to gross revenue, net revenue, and profits) derived by P&G and Warner Chilcott, on an annual basis, from sales of Actonel® 150 mg product for each year from the date of first sale to the present.

25. The nature and type of advertising, marketing, and promotion by P&G, Warner Chilcott, Sanofi-Aventis, or any marketing partner of Actonel® 150 mg product (e.g., materials provided to physicians, managed-care organizations, pharmacy-benefit managers, pharmacists, and/or consumers; advertisements appearing in periodicals, journals, magazines, and/or newspapers; e-promotions; physician-education materials and patient-education

materials), including the amount of any related expenditures on a monthly, quarterly, and/or annual basis, such as detailing of physicians, discounts, deductions, incentive programs, rebates, and advertising, and the identification of documents reflecting or demonstrating the foregoing.

26. The identity and role of any co-marketing, co-promotion, or co-advertising partner of P&G prior to and after the date P&G launched its Actonel® 150 mg product in the United States, and the identification of documents reflecting or demonstrating the foregoing: The relevant market for Actonel® 150 mg product, including:(a) the share of the relevant market Actonel® 150 mg product occupied from the date P&G launched its Actonel® 150 mg product through the present, on a monthly, quarterly, and/or annual basis; (b) the market shares of any other bisphosphonate products, including, but not limited to, 2.5 mg Actonel®, Fosamax® and Actonel®, from the first commercial marketing of P&G's Actonel® 150 mg product through the present; and (c) identification of documents reflecting or demonstrating the foregoing.

27. From the date P&G launched its Actonel® 150 mg product in the United States to present, the impact of competitor products (including, but not limited to, Fosamax®, generic alendronate, Atelvia®, Reclast®, Boniva®, and non-bisphosphonates) on the gross sales of Actonel® 150 mg product.

28. From six months prior to the date P&G launched its Actonel® 150 mg product in the United States to present, any analysis or forecast regarding the impact of competitor products (including, but not limited to, Fosamax®, generic alendronate, Atelvia®, Reclast®, Boniva®, and non-bisphosphonates) on the gross sales of Actonel® 150 mg product.

29. From the date P&G launched its Actonel® 150 mg product in the United States, the extent to which advertising, marketing, and promotion by P&G or any marketing partner regarding Actonel® 150 mg product has affected sales of Actonel® 150 mg product.

30. P&G's business plans, price lists, pricing policies, pricing plans, marketing plans, sales plans, pricing forecasts, marketing forecasts, sales forecasts, pricing strategies, marketing strategies, sales strategies, pricing analyses, marketing analyses, sales analyses, pricing decisions, and marketing decisions concerning Actonel® 150 mg product.

31. For each year following P&G's launch of its Actonel® 150 mg product in the United States, the total number of sales representatives from P&G or any other co-marketing, co-promotion, or co-advertising partner of P&G assigned to the promotion, sale and detailing of Actonel® 150 mg product to customers.

32. The total amount spent by or on behalf of P&G on direct-to-consumer marketing of Actonel® in the United States on a monthly basis since the initiation of marketing efforts in the United States related to Actonel®.

33. From the date P&G launched its Actonel® 150 mg product in the United States to the present, the percentage of patients taking that product for (i) prevention of osteoporosis and (ii) treatment of osteoporosis.

4

34. From the date P&G launched its Actonel® 150 mg product in the United States to the present, the revenue derived by P&G (including but not limited to gross sales, net sales, and profits), on an annual basis, from sales of that product for the prevention of osteoporosis.

35. From the date P&G launched its Actonel® 150 mg product in the United States to the present, the revenue derived by P&G (including but not limited to gross sales, net sales, and profits), on an annual basis, from sales of that product for the treatment of osteoporosis.

36. Since P&G launched its Actonel® 150 mg product in the United States, the annual new prescription growth and total prescription growth in the United States.

37. Since P&G launched its Actonel® 150 mg product in the United States, the comparison of new prescription growth and total prescription growth in the United States with other competitive products, including but not limited to generic alendronate, Fosamax®, Boniva®, Atelvia®, Reclast®, and any non-bisphosphonates.

38. The identification of any and all reports generated, obtained by, or purchased by P&G identifying the prescription and overall sales of the Actonel® 150 mg product as compared to other products including but not limited to IMS reports and data.

39. The formulary status of Actonel® 150 mg product at any time since its launch in the United States.

40. The identification of any and all FDA-approved additional indications of use obtained for the Actonel® 150 mg product since its initial FDA approval in the United States.

41. Medicare and Medicaid reimbursement policies as applied to the Actonel® 150 mg product at any time since its launch in the United States.

42. The status of managed care coverage for the Actonel® 150 mg product at any time since its launch in the United States.

43. The availability and pricing of competitive products since the launch of the Actonel® 150 mg product in the United States.

44. Patent marking of the Actonel® 150 mg product at any time since its launch in the United States.

45. Warner Chilcott's and P&G's search for, and collection of, documents responsive to Teva USA's document requests, including, but not limited to, the methods used to identify, retrieve, collect and store responsive documents; the locations searched; and the current and past custodian(s) of the documents.

46. The background and qualifications of the person(s) who testify(ies) on Warner Chilcott's behalf regarding the preceding matters.

## **CERTIFICATE OF SERVICE**

I, Karen L. Pascale, Esquire, hereby certify that on July 11, 2011, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to all registered counsel of record.

I further certify that I caused a copy of the foregoing document to be served the following counsel of record in the manner indicated:

***By E-Mail***:

Frederick L. Cottrell, III  [cottrell@rlf.com]
Steven J. Fineman  [sfineman@rlf.com]
Laura D. Hatcher  [hatcher@rlf.com]
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
Wilmington, DE  19801
  *Counsel for Plaintiffs*

William F. Lee [william.lee@wilmerhale.com]
Hollie L. Baker [hollie.baker@wilmerhale.com]
Vinita Ferrera [vinita.ferrera@wilmerhale.com]
Allen C. Nunnally  [Allen.Nunnally@wilmerhale.com]
Christopher R. Noyes [christopher.noyes@wilmerhale.com]
**WILMER HALE LLP**
60 State Street
Boston, MA  02109
  *Counsel for Plaintiff Warner Chilcott Company LLC*

David B. Bassett [david.bassett@wilmerhale.com]
**WILMER HALE LLP**
399 Park Avenue
New York, NY  10022
  *Counsel for Plaintiff Warner Chilcott Company LLC*

Mark E. Waddell [mwaddell@loeb.com]
Joshua H. Harris [jharris@loeb.com]
Warren K. MacRae [wmacrae@loeb.com]
**LOEB & LOEB LLP**
345 Park Avenue
New York, NY 10154
  *Counsel for Plaintiff Hoffman-La Roche Inc.*

Richard W. Riley, Esquire [rwriley@duanemorris.com]
**DUANE MORRIS LLP**
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
  *Counsel for Defendants Apotex, Inc. and Apotex Corp.*

Steven E. Feldman  [steven.feldman@huschblackwell.com]
Hartwell P. Morse, III  [hartwell.morse@huschblackwell.com]
Louise T. Walsh  [louise.walsh@huschblackell.com]
Sherry L. Rollo [sherry.rollo@huschblackwell.com]
Philip D. Segrest, Jr. [Philip.Segrest@huschblackwell.com]
**HUSCH BLACKWELL SANDERS WELSH & KATZ LLP**
120 South Riverside Plaza, 22nd Floor
Chicago, IL  60606
  *Counsel for Defendants Apotex, Inc. and Apotex Corp.*

John C. Phillips, Jr.  [jcp@pgslaw.com]
Megan C. Haney  [mch@pgslaw.com]
**PHILLIPS, GOLDMAN & SPENCE, P.A.**
1200 North Broom Street
Wilmington, DE  19806
  *Counsel for Defendant Sun Pharma Global, Inc.*

Eric C. Cohen  [eric.cohen@kattenlaw.com]
Jeremy C. Daniel  [jeremy.daniel@kattenlaw.com]
**KATTEN MUCHIN ROSENMAN LLP**
525 West Monroe Street
Chicago, IL 60661-3693
  *Counsel for Defendant Sun Pharma Global, Inc.*

Richard K. Herrmann  [rherrmann@morrisjames.com]
Mary B. Matterer  [mmatterer@morrisjames.com]
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
  *Counsel for Defendant Mylan Pharmaceuticals, Inc.*

Edgar H. Haug  [EHaug@flhlaw.com]
Robert E. Colletti [RColletti@flhlaw.com]
Richard E. Parke [RParke@flhlaw.com]
**FROMMER LAWRENCE & HAUG LLP**
745 Fifth Avenue
New York, NY 10151 USA
  *Counsel for Defendant Mylan Pharmaceuticals, Inc.*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Karen L. Pascale*

_____
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
302-571-6600

*Attorneys for Defendant
Teva Pharmaceuticals USA, Inc.*

OF COUNSEL:

James Galbraith
Antony Pfeffer
Peter L. Giunta
Vincent J. Rubino
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004
(212) 425-7200