**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| WARNER CHILCOTT COMPANY, LLC and HOFFMANN-LA ROCHE INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> TEVA PHARMACEUTICALS USA, INC., <br><br> *Defendant*. | C.A. No. 1:08-cv-0627-LPS <br> C.A. No. 1:11-cv-00081-LPS |
| WARNER CHILCOTT COMPANY, LLC and HOFFMANN-LA ROCHE INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> APOTEX, INC. and APOTEX CORP., <br><br> *Defendants*. | C.A. No. 09-143-LPS <br> (consolidated with C.A. No. 08-627-LPS) |
| WARNER CHILCOTT COMPANY, LLC and HOFFMANN-LA ROCHE INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> MYLAN PHARMACEUTICALS, INC., <br><br> *Defendant*. | C.A. No. 10-285-LPS <br> (consolidated with C.A. No. 08-627-LPS) |
| THE PROCTER & GAMBLE COMPANY and HOFFMANN-LA ROCHE INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> SUN PHARMA GLOBAL FZE, <br><br> *Defendant*. | C.A. No. 09-61-LPS <br> (consolidated with C.A. No. 08-627-LPS) <br><br> **REDACTED - PUBLIC VERSION** |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT OF INVALIDITY
FOR OBVIOUSNESS UNDER 35 U.S.C. § 103**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

NATURE AND STAGE OF THE PROCEEDINGS .................................................... 2

SUMMARY OF ARGUMENT ................................................................................... 2

STATEMENT OF FACTS .......................................................................................... 3

    I.     TREATMENT OF OSTEOPOROSIS WITH BISPHOSPHONATES ................. 3

    II.    THE PRIOR ART DISCLOSED ONCE-MONTHLY DOSING OF
         RISEDRONATE TO TREAT OSTEOPOROSIS ..................................................... 5

    III.   THE PERSON OF ORDINARY SKILL WOULD HAVE BEEN
         MOTIVATED TO  USE A MONTHLY REGIMEN ............................................ 7

    IV.   A PERSON OF ORDINARY SKILL WOULD HAVE EXPECTED
         ONCE-MONTHLY RISEDRONATE TO BE EFFECTIVE ................................ 8

    V.    THE PERSON OF ORDINARY SKILL WOULD HAVE EXPECTED
         ONCE-MONTHLY RISEDRONATE TO BE SAFE ......................................... 10

ARGUMENT................................................................................................................ 11

    I.     SUMMARY JUDGMENT STANDARD................................................................ 11

    II.    OBVIOUSNESS ........................................................................................................ 12

    III.   THE ASSERTED CLAIMS OF THE PATENTS IN SUIT ARE
         INVALID  BECAUSE THE CLAIMED INVENTION WOULD
         HAVE BEEN OBVIOUS ...................................................................................... 13

         A.    The Asserted Claims ................................................................................. 13

         B.    The Scope and Content of the Prior Art.................................................... 14

             1.    The Prior Art Disclosed Once-Monthly Administration of
                  Risedronate  to Treat Osteoporosis ............................................... 14

             2.    The Prior Art Taught That The 150 mg Monthly Regimen
                  Would Successfully Treat Osteoporosis ....................................... 14

         C.    The Differences Between The Prior Art and Claimed Invention ............ 16

         D.    The Level of Skill in the Art was High..................................................... 17

01:12230196.1

E.    Secondary Considerations Do Not Support the Patentability of Once-Monthly Risedronate ........................................................................... 17

1.    The Near Simultaneous Invention of Once-Monthly Risedronate by Others is Evidence of Obviousness ...................... 18

2.    The "Commercial Success" of Once-Monthly Risedronate is Irrelevant ................................................................ 19

CONCLUSION ................................................................................................................... 20

01:12230196.1

# TABLE OF AUTHORITIES

**Cases**

*Brimonidine Patent Litig.*, *In re*,
    643 F.3d 1366 (Fed. Cir. 2011).................................................................... 13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................... 11

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)......................................................................................... 12

*Hoffmann-La Roche Inc. v. Apotex, Inc.*,
    No. 07-4417 (SRC)(MAS); 2012 WL 1637736 (D.N.J. May 12, 2012) ................... passim

*KSR Int'l v. Teleflex, Inc.*,
    550 U.S. 398 (2007)..................................................................................... 17

*Media Techs. Licensing, LLC v. Upper Deck Co.*,
    596 F.3d 1334 (Fed. Cir. 2010).................................................................... 11

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005)........................................................ 1, 17, 19, 20

*Merck & Co.*, *In re*,
    800 F.2d 1091, 1098 (Fed. Cir. 1986)........................................................... 18

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011)................................................................................. 12

*Nat'l Steel Co., Ltd. v. Canadian Pac. Ry., Ltd.*,
    357 F.3d 1319 (Fed. Cir. 2004).................................................................... 18

*O'Farrell*, *In re*,
    853 F.2d 894 (Fed. Cir. 1988)...................................................................... 15

*Ormco Corp. v. Align. Tech., Inc.*,
    498 F.3d 1307 (Fed. Cir. 2007).................................................................... 13

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F. 3d 1348 (Fed. Cir. 2007).................................................................... 19

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009)...................................................................... 19

*Ryko Mfg. Co. v. Nu-Star, Inc.*,
    950 F.2d 714 (Fed. Cir. 1991)...................................................................... 11

*Siemens-Elema AB v. Puritan-Bennett Corp.*,
13 U.S.P.Q.2d 1804 (S.D. Cal. 1989),
*aff'd*, 925 F.2d 1480 (Fed. Cir. 1991) ................................................................................. 18

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983) .......................................................................................... 16

*Tokai Corp. v. Easton Enters., Inc.*,
632 F.3d 1358 (Fed. Cir. 2011) .......................................................................................... 11

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
No. 07-1299 (SRC), 2010 WL 1799457 (D.N.J. May 5, 2010),
*aff'd*, 642 F.3d 1370 (Fed. Cir. 2011) ................................................................................. 11

**Statutes**

35 U.S.C. § 103 ....................................................................................................................... 1

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................. 11

## INTRODUCTION

Plaintiff Hoffmann-La Roche ("Roche") is the licensor and plaintiff Warner Chilcott the licensee of the patents in suit, U.S. Patent Nos. 7,192,938 and 7,718,634. (Yates Decl. Exs. 2 & 3.)[1] The patents have the same specification. The asserted claims of both patents are directed to methods for "treating or inhibiting" postmenopausal osteoporosis by once-monthly administration of a tablet containing about 150 mg of the drug risedronate.[2] Long before the priority date for these patents, persons skilled in the art knew that risedronate could be effectively administered as a once-daily 5 mg tablet or a once-weekly 35 mg tablet. In addition, the vast prior art literature included explicit teachings of once-monthly dosing to enhance patient compliance and convenience. Thus, the asserted claims of these patents are invalid because the invention would have been obvious to a person of ordinary skill in the art. 35 U.S.C. § 103(a).

This is the third case in which pharmaceutical companies have attempted to extend their exclusivities over drugs in this therapeutic class by obtaining patents that claim dosing regimens with longer intervals between doses. In a case involving the '634 patent in suit here, Judge Chesler in the District of New Jersey held invalid on summary judgment virtually identical claims, which recited the same regimen for ibandronate, a closely related drug. *Hoffmann-La Roche Inc. v. Apotex, Inc.*, No. 07-4417 (SRC)(MAS); 2012 WL 1637736 (D.N.J. May 12, 2012) ("*Apotex*"). In *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005) ("*Merck*"), the court found invalid as obvious Merck's patent claims to a once-weekly dosing regimen for its drug, alendronate.

---

[1] This motion is supported by the Declaration of John Yates, an acknowledged expert in the treatment of osteoporosis and the development and use of bisphosphonate drugs for diseases of bone resorption. The referenced exhibits are exhibits to Dr. Yates's declaration.

[2] The 150 mg number in the claims refers to "an amount of the pharmaceutically acceptable salt of risedronic acid that is equivalent to 150 mg of risedronic acid." (Yates Decl. Exs. 2 & 3.)

For essentially the same reasons that Merck's once-weekly alendronate patent and the ibandronate claims of the '634 patent are invalid, the undisputed material facts here establish that the asserted claims are invalid as a matter of law. A trial would serve no purpose and summary judgment should be entered that all the asserted claims are invalid.

## NATURE AND STAGE OF THE PROCEEDINGS

Each of the defendants in these consolidated cases filed an ANDA seeking FDA approval to market a generic version of Warner Chilcott's drug product Actonel® in the once-monthly 150 mg tablet form. In accordance with the Hatch-Waxman Act, each defendant filed "Paragraph IV" certifications that the patents in suit are invalid or would not be infringed by the marketing of its proposed product. Within the requisite 45-day periods, plaintiffs Warner Chilcott, the NDA holder for once-monthly Actonel®, and Roche, the patent owner, brought these actions against the defendants.

All discovery has been completed, and the Court set the case for trial beginning July 23, 2012. On May 25, 2012, however, in light of the New Jersey district court's decision in Apotex, this Court vacated the trial date and the date for filing the pretrial order, and set a briefing schedule for this motion for summary judgment. (D.I. 322.)

## SUMMARY OF ARGUMENT

1.    The claimed invention of once-monthly administration of risedronate at about 150 mg to treat osteoporosis would have been obvious to a person of ordinary skill. The prior art disclosed that risedronate could be effectively administered for the treatment of osteoporosis on a monthly basis.

2.    As of the May 2002 priority date for the patents in suit, the "total dose concept" for risedronate and other drugs in the same class was well established. That is, persons skilled in the art understood that for drugs such as risedronate, the total dose—rather than the frequency of

01:12230196.1

2

dosing—determined the efficacy of the drug.  This concept was understood to apply specifically to risedronate, and a once-monthly dose of 30 times the daily 5 mg dose would have been obvious.

3.      The person of ordinary skill would have been motivated to administer a 150 mg risedronate tablet, once-monthly, with a reasonable expectation of success in treating or inhibiting osteoporosis.

4.      No secondary considerations support the nonobviousness of the invention claimed in the patents in suit.

**STATEMENT OF FACTS**

**I.      TREATMENT OF OSTEOPOROSIS WITH BISPHOSPHONATES**

Osteoporosis is a disease that predominantly affects postmenopausal women.  It involves an excess of bone "resorption," and a corresponding loss of bone, which results in an increase in the risk of bone fractures.[3]

In the 1980s, Merck and Procter & Gamble, Warner Chilcott's predecessor in interest, explored the use of members of a class of chemical compounds called "bisphosphonates" to treat osteoporosis.  Merck focused on alendronate, and P&G developed risedronate.  Both compounds are members of the same subclass, known as "nitrogen containing bisphosphonates" or "NCBPs" because the molecules of both include a nitrogen atom.  Ibandronate, which Roche developed, and which is also claimed in the '634 patent, is likewise an NCBP.  (Yates Decl. ¶ 21.)  All NCBPs have the same mechanism of action and similar pharmacokinetics, and the person of

---

[3]      *See* Yates Decl. ¶¶ 15–32, for an explanation of osteoporosis and the mechanism of action of bisphosphonate drugs to treat it.

ordinary skill could apply knowledge and experience from one NCBP to NCBPs as a class. (Yates Decl. ¶¶ 23–30.)

In 1995, Merck received FDA approval to market alendronate as a 10 mg daily tablet for the treatment of osteoporosis. The product Fosamax®, though widely-accepted, had drawbacks. Patients had to take the drug before eating because food interfered with drug absorption into the bloodstream. The compound could cause upper gastrointestinal irritation, and patients not only had to take the drug in an upright sitting or standing position with a full glass of water to prevent esophageal "pill sticking" and reflux of alendronate-containing digestive fluid, but also to remain sitting upright or standing for half an hour thereafter. (Yates Decl. ¶¶ 26, 34.)

Persons skilled in the art recognized that NCBPs have long half-lives, which means that they are active for a long time after administration. Persons skilled in the art also recognized that, for NCBP efficacy, the total dose administered within a time interval was more important than the frequency with which the drug was administered within that period. This "total dose concept" of NCBP efficacy led Merck scientists and others to suggest that alendronate could be administered once-weekly rather than once-daily. Merck thereupon developed and in 2000 received FDA approval for a once-weekly 70 mg tablet, i.e., a tablet to be administered once every seven days at seven times the daily dose. Once-weekly Fosamax® was a large commercial success, and quickly supplanted the daily regimen. (Yates Decl. ¶ 36.)

Meanwhile, in 2000 P&G received approval for once-daily 5 mg risedronate (Actonel®) tablets. P&G studies showed that for treatment of osteoporosis the appropriate daily dose of risedronate is 5 mg. Risedronate had the same dosing constraints as alendronate, i.e., taken with a full glass of water and without food, and the patient was required to sit or stand for a half hour after taking the drug. In 2002, a prior art publication of clinical trial results showed that in

accordance with the total dose concept 35 mg weekly risedronate—every seven days at seven times the daily dose—was as effective as 5 mg daily.[4]  (Yates Decl. ¶ 37; Ex. 8.)  Although the weekly doses of alendronate and risedronate still carried with them the dosing inconveniences of the daily versions, patients were required to endure them only once a week.

## II.    THE PRIOR ART DISCLOSED ONCE-MONTHLY DOSING OF RISEDRONATE TO TREAT OSTEOPOROSIS

As Merck and P&G were developing their once-weekly formulations, others in the field were describing even longer-interval regimens.  Dr. Richard Mazess, who developed a highly successful device for measuring bone mineral density ("BMD")—a key parameter for diagnosing osteoporosis—published *Lunar News*, a quarterly newsletter for those in the bone disease field. (Yates Decl. ¶ 48.)  The Winter 2000 issue of *Lunar News* included an article entitled *Update: Bisphosphonates*, which stated:

> Experts believe risedronate has met all standards for efficacy and should receive FDA approval in the USA for prevention and treatment of osteoporosis in Spring 2000.  Risedronate doses will be either 5 mg/day or a single 35 mg dose once per week; a 40 mg dose of alendronate is available and is effective in once-per-week doses. *Weekly, or even monthly, dosing if done properly could foster long-term compliance as well as minimizing side effects.*

(Yates Decl. Ex. 12 (emphasis added).)  Thus, long before the filing date for the patents in suit, *Lunar News* had already stated the essential concept of their asserted claims: administer risedronate once per month to treat osteoporosis.

P&G's own development efforts also resulted in the prior art disclosure of once-monthly dosing of risedronate to treat osteoporosis.  P&G scientists Schofield *et al*. filed U.S. Patent Appl'n Publ'n 2003/0118634 ("Schofield"), which claims priority to a December 21, 2001

---

[4]    Based on that clinical trial, the FDA approved once-weekly risedronate just after the priority date for the patents in suit.  (Yates Decl. ¶ 37.)

provisional application, and which discloses once-monthly oral dosing of bisphosphonates, including risedronate. (Yates Decl. ¶¶ 54–58; Ex. 18.) Schofield discloses a "maintenance dose" of risedronate in an "effective amount" to increase bone mass. (Yates Decl. ¶ 55; Ex. 18 at [0014].) The maintenance dose can be administered daily, or the "equivalent" dose may be "given every other day, twice a week, weekly, biweekly, or *monthly*." (*Id.* at [0037] (emphasis added).) An equivalent weekly dose for osteoporosis treatment appears in Example 1, which describes the equivalent of 5 mg per day as a weekly dose of 35 mg (5 mg/day times seven days). (*Id.* at [0042].) Thus, a person of ordinary skill in the art would have recognized that the equivalent monthly risedronate dose would be 150 mg (5 mg/day times 30 days). (Yates Decl. ¶ 55.) Schofield further discloses continuing that treatment on a monthly basis. (Yates Decl. Ex. 18 at [0008], [0015].)

Schofield also discloses using a "loading dose"—an initial higher dose of a drug administered at the beginning of a course of treatment—before the maintenance dose. (Yates Decl. ¶ 56.) In an attempt to distinguish Schofield, Roche amended the asserted claims of the patents in suit to exclude loading doses. *See Apotex* at *6. Even with this distinction, Schofield still teaches the essential concept. Schofield asserts that the loading dose "decreases bone turnover and increases bone mass at a *faster* rate leading to *faster* fracture reduction." (Yates Decl. Ex. 18 at [0007] (emphasis added).) That statement implies that a maintenance dose alone would be effective in treating osteoporosis, although perhaps not as quickly as a maintenance dose preceded by a loading dose. (Yates Decl. ¶ 56.) In *Apotex*, the court found that despite Roche's attempt to distinguish Schofield by excluding the loading dose from the claims, Schofield discloses the essential concept of the claimed method:

> Despite the fact that the patentee was able to overcome the obviousness rejection [based on Schofield], it seems to this Court that Schofield's treatment method for the maintenance period is very, very close to the treatment method at issue.

*Apotex* at *6.

Since osteoporosis must be treated for many years, and Schofield discloses that the maintenance dose "may be continued indefinitely," the skilled person would have recognized that after a relatively short time the effect of the initial loading dose would become insignificant compared to the effect of the repeated monthly doses, and that the therapeutic benefit would be attributable to the maintenance dose.  (Yates Decl. ¶ 57; Ex. 18 at [0025].)

In *Apotex*, the court found that Schofield "expresses the total dose concept: one may treat osteoporosis by administering a particular amount of bisphosphonate as a daily dose, or one may administer the proportionately equivalent amount intermittently (monthly, for instance)." *Apotex* at *6.  The court further held that "there is no meaningful difference between the patented treatment methods at issue and the method employed in Schofield's maintenance period." *Apotex* at *13.  Except for the identity of the NCBP—ibandronate rather than risedronate—the "patented treatment methods" at issue in *Apotex* are the same as the method claims asserted here.

## III.   THE PERSON OF ORDINARY SKILL WOULD HAVE BEEN MOTIVATED TO USE A MONTHLY REGIMEN

In 2002, the instructions for all dosage forms of risedronate and alendronate required the patient to take the drug without food, with a full glass of water, and to remain standing or sitting upright for a half hour after taking the drug.  The full glass of water and prohibition against reclining were precautions against gastrointestinal irritation.  Obviously, a dosing regimen that required patients to endure these inconveniences less often would be appealing, and persons skilled in the art would have seen from the sales of once-weekly Fosamax® beginning in 2000 that doctors and patients much preferred the convenience of less-frequent dosing.  Accordingly,

01:12230196.1

7

as *Lunar News* recognized in 2000, a person skilled in the art would have been motivated to consider a once-monthly dosing regimen, expecting such a regimen to benefit patients.

## IV.    A PERSON OF ORDINARY SKILL WOULD HAVE EXPECTED ONCE-MONTHLY RISEDRONATE TO BE EFFECTIVE

The success of once-weekly alendronate and the literature showing the safety and efficacy of once-weekly risedronate demonstrated that the total dose concept applies to NCBPs over those intervals.  Clinical studies also proved that it applies over much longer intervals.

In 2001, Riis *et al.* published a Roche-sponsored clinical trial involving ibandronate. (Yates Decl. ¶ 40–41; Ex. 9.)  In the trial, one group of osteoporosis patients received a daily dose of 2.5 mg for a quarter, and the other received 20 mg every other day for 12 doses, then nothing for the remaining nine weeks of the quarter.  Thus, all patients received essentially the same total dose.  The BMD measurements showed that the two different regimens gave the same result—both significantly increased BMD.  (Yates Decl. ¶ 42.)  Riis also measured other biochemical markers of bone resorption, and showed that both regimens suppressed them to similar extents.[5]  Riis concluded:

> These results confirm the preclinical data showing that it is the total dose over a predefined period and not the dosing regimens that is the determining factor for effect on bone mass and architecture after ibandronate treatment.

The authors also stated:

> In conclusion, this trial also showed that intermittent ibandronate is as effective as the continuous treatment in terms of significantly increasing BMD at the spine and hip and suppressing markers of bone turnover.

(Yates Decl. ¶ 42; Ex. 9 at 1877.)

---

[5]    Suppression of bone turnover markers is an indication of effectiveness in inhibiting bone resorption.  (Yates Decl. ¶ 32.)

Thus, Riis taught those skilled in the art that the total dose concept for an NCBP applied even over intervals of more than two months. Although the NCBP Riis studied was ibandronate rather than risedronate, persons skilled in the art knew that those two NCBPs would probably exhibit similar properties. (Yates Decl. ¶ 23.)

**REDACTED**

The *Apotex* court concluded that with the publication of Riis "the game changed." *Apotex* at *9. Any doubts about the applicability of the total dose concept over intervals longer than a week or two evaporated with that publication. *Id.* at *9–10. Indeed, Dr. Bauss, the principal inventor on the patents in suit, characterized the Riis paper as a "breakthrough." (Giunta Decl. Ex. 1 at 41:15–42:4, 43:2–10); *see Id..*

Other studies showed that the total dose concept applies specifically to risedronate. Delmas *et al.* studied patients with chemotherapy-induced menopause. (Yates Decl. ¶ 65; Ex. 23.) Bone loss attributable to induced menopause is similar to that caused by osteoporosis. One patient group received placebo and the other received risedronate on a 12-week cycle of 30 mg/day for two weeks followed by ten weeks with no drug, which provided the same total dose as the FDA-approved 5 mg daily dose every day for the same period. Patients in the treatment group showed increases in BMD relative to placebo similar to those for osteoporosis patients receiving a 5 mg daily dose. These results demonstrated that the total dose concept applied even to intervals as long as ten weeks. (Yates Decl. ¶ 67–69.)

Zegels *et al.* tested three risedronate dosing regimens, all of which involved the same total dose. (Yates Decl. ¶ 70; Ex. 22.) They found that bone resorption markers were suppressed

01:12230196.1

9

in all treatment groups, and that a regimen with a drug-free interval of three weeks yielded a continuous suppression of bone resorption.  Zegels concluded:

> Due to the long skeletal half-life of bisphosphonates, it might well be expected that the total dose administered . . . would be more important than the time course of administration, in terms of the impact on bone metabolism.

(Yates Decl. Ex. 22 at 110–11.)

These and other studies demonstrated that the total dose concept applied to NCBPs generally and to risedronate in particular.  (Yates Decl. ¶ 84.)  The person skilled in the art would have expected that dosing such compounds with substantial intervals between doses would have been effective to treat osteoporosis.  Nothing suggested otherwise.

## V.    THE PERSON OF ORDINARY SKILL WOULD HAVE EXPECTED ONCE-MONTHLY RISEDRONATE TO BE SAFE

The principal safety issue for NCBPs was that such compounds could cause upper gastrointestinal irritation.  (Yates Decl. ¶¶ 26, 34.)  The total dose concept leads to a monthly risedronate dose of 150 mg (30 times the 5 mg daily dose), and nothing in the art suggested that such a dose would be deleterious.  In fact, prior art published patent application WO 01/15703 disclosed unit doses of up to 200 mg of risedronate for intermittent dosing.  The stated purpose of such regimens was "minimizing the occurrence of or potential for adverse gastrointestinal effects."  (Yates Decl. ¶ 82; Ex. 21.)  Moreover, by 2002 studies had shown that less-frequent dosing of NCBPs actually reduced the incidence of gastrointestinal irritation attributable to NCBPs.  Schnitzer *et al.* compared once-daily dosing of 10 mg alendronate tablets with once-weekly dosing of 70 mg tablets and found that the reported incidence of gastrointestinal adverse experiences was less with the weekly regimen notwithstanding that the tablet contain seven times the active ingredient of the 10 mg tablet.  (Yates Decl. ¶ 78; Ex. 26.)  Another study that involved endoscopic examination of patients showed that the weekly alendronate dose of 70 mg

01:12230196.1

10

did not increase gastric irritation compared to placebo. (Yates Decl. ¶ 79; Ex. 27.) A year-long study that involved administering 160 mg of alendronate *weekly* stated that the regimen was "well tolerated." (Yates Decl. ¶ 83; Ex. 30.)

The *Apotex* court noted that the prior art, including Schofield, suggested that the loading dose could be as much as 300 mg per day. The court held that the references were "sufficient to give the skilled artisan a reasonable expectation of safety with a 150 mg dose." *Apotex* at *17. The uniformly positive teachings of the prior art, coupled with the perception that risedronate was even safer than alendronate (Yates Decl. ¶ 80), would have led the skilled person to believe that an increase in dose to 150 mg would not raise any safety concerns.

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine issue as to any material fact" and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and is material if, under the substantive law, it would affect the outcome of the suit." *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, No. 07-1299 (SRC), 2010 WL 1799457 at *1 (D.N.J. May 5, 2010), *aff'd*, 642 F.3d 1370 (Fed. Cir. 2011).

Summary judgment is as appropriate in patent cases as in any other type of cases, and courts frequently find patents invalid for obviousness on summary judgment. *See*, *e.g.*, *Tokai Corp. v. Easton Enters.*, *Inc.*, 632 F.3d 1358 (Fed. Cir. 2011) (affirming district court's grant of summary judgment of invalidity for obviousness); *Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334 (Fed. Cir. 2010) (same); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714 (Fed. Cir. 1991) (same); *Apotex*, *supra*.

## II.    OBVIOUSNESS

A patent claim is invalid if the claimed subject matter would have been obvious to a person of ordinary skill in the art.  35 U.S.C. § 103(a).  Obviousness is a question of law premised upon several underlying factual determinations: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the prior art and the claimed invention.  In addition, the court must consider such secondary considerations as commercial success, satisfaction of a long-felt need, the failure of others, simultaneous invention by others, and whether the invention exhibits any unexpectedly beneficial results.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Although the patent challenger bears the burden of proof by "clear and convincing" evidence, that burden applies only to the underlying facts, because obviousness is an issue of law.  *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2253 (2011) (Breyer, J., concurring) (the "ultimate question of patent validity turns on the correct answers to legal questions" which depends on "how the law applies to facts as given"; the clear and convincing "standard of proof applies to questions of fact and not to questions of law").

Here, the facts are not disputed.  The references on which defendants rely are undisputedly in the prior art, and no dispute exists as to what those references say.  The only dispute is one of law: whether in light of those references, the invention would have been obvious.  The Court can and should decide that issue defendants' favor.

**III.   THE ASSERTED CLAIMS OF THE PATENTS IN SUIT ARE INVALID BECAUSE THE CLAIMED INVENTION WOULD HAVE BEEN OBVIOUS**

**A.     The Asserted Claims**

Plaintiffs have asserted eight claims from two patents.[6]  Some claims are broader than others, but if the narrowest claimed invention would have been obvious, then no broader claim can be valid.  *See In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1372 (Fed. Cir. 2011) (focusing on the narrowest claim of four related patents in assessing validity of 69 claims); *Ormco Corp. v. Align. Tech., Inc.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007) (where a dependent claim is obvious, the broader independent claim from which it depends must also be obvious). Here, every asserted claim encompasses a method of treating or inhibiting postmenopausal osteoporosis by administering, without first administering a loading dose, once monthly on a single day, a tablet that contains a salt of risedronic acid in an amount equivalent to 150 mg of the acid.[7]  If that method would have been obvious in May 2002, then all the asserted claims are invalid.  In fact, the prior art did teach that method to the person of ordinary skill in the art.

---

[6]     Claims 6, 8, 9, 13, 14, and 15 of the '938 patent and claims 9 and 10 of the '634 patent. (set forth at Yates Decl. ¶¶ 9–10.)

[7]     Bisphosphonates can be made as free acids, e.g., risedronic acid or alendronic acid.  The acids can be converted to pharmaceutically acceptable salts, which are denoted by the "–ate" suffix, e.g., alendronate, risedronate, and ibandronate.  It is these salts that are formulated into tablets.  Alendronate and risedronate, which are sodium salts of alendronic acid and risedronic acid, were the active ingredients of Actonel® and Fosamax®, respectively.  Thus, the recitation in the claims of "pharmaceutically acceptable salts" adds nothing of substance, since that was the form in which the drugs had already been used.  (Yates Decl. ¶ 22.)

**B.      The Scope and Content of the Prior Art**

**1.      The Prior Art Disclosed Once-Monthly Administration of Risedronate to Treat Osteoporosis**

The prior art did more than suggest once-monthly dosing of risedronate to treat osteoporosis; it stated that concept explicitly.  *Lunar News* published that concept more than two years before the filing date of the patents in suit:

> Risedronate doses will be either 5 mg/day or a single 35 mg dose once per week. . . .  *Weekly, or even monthly, dosing if done properly could foster long-term compliance as well as minimizing side effects.*

(Yates Decl. ¶ 47; Ex.12.)  *Lunar News* also stated the advantages of the concept: improving patient compliance and lessening the incidence of side effects.  The only part of the claimed invention missing from this disclosure is the dosage strength.  However, the *Lunar News* disclosure states the total dose concept, referring to the 35 mg weekly dose (seven times the daily dose).  The logical extension of that concept is to 150 mg for the monthly dose (30 times the daily dose).

Schofield likewise disclosed treatment of osteoporosis with a loading dose followed by a once-monthly maintenance dose.  Schofield taught that the maintenance dose should be equivalent to the daily dose, which implies a maintenance dose of 150 mg per month.  The *Apotex* court found that there was no genuine dispute that Roche's claimed regimen and the maintenance dose regimen of Schofield were not meaningfully different.  *Apotex* at *13.

**2.      The Prior Art Taught That The 150 mg Monthly Regimen Would Successfully Treat Osteoporosis**

By May 2002, the scientific literature supported the "total dose concept" for bisphosphonate treatment.  Several clinical studies had already shown that for NCBPs in general, and for risedronate in particular, the total dose was more important than the frequency of dosing even over substantial intervals.  The Riis study, after which "the game changed," dramatically

01:12230196.1

14

showed that for ibandronate daily dosing and dosing that included more than two-month drug-free intervals gave equivalent results, provided the total dose was the same.  (Yates Decl. ¶ 41.) As the *Apotex* court stated: "there can be no dispute that . . . Riis 2001 taught the total dose concept."  *Apotex* at \*14.

Other studies showed that risedronate dosed on an intermittent basis is effective.  Delmas taught a person of ordinary skill that intermittent dosing of risedronate has an effect comparable to that seen with continuous daily dosing, and Zegels's data demonstrated that intermittent regimens for treating patients with osteoporosis suppressed bone resorption at a similar magnitude as continuous treatment using the same total dose.  (Yates Decl. ¶¶ 67–68, 75–77.)

Plaintiffs and their experts have nit-picked the prior art scientific literature that suggests monthly dosing, but have never offered any contradictory evidence.  Plaintiffs' carping boils down to the assertion that the prior art references did not conclusively prove that the once-monthly regimen would be safe and effective.  Defendants, however, are not required to demonstrate that the prior art proved beyond peradventure that the once-monthly regimen would succeed.  All that is required is that the prior art provide a "reasonable expectation" of success. *See In re O'Farrell*, 853 F.2d 894, 903–904 (Fed. Cir. 1988):

> Obviousness does not require absolute predictability of success.  Indeed, for many inventions that seem quite obvious, there is no absolute predictability of success until the invention is reduced to practice. . . .  For obviousness under § 103, all that is required is a reasonable expectation of success.

Here, all the prior art points in the same direction: toward once-monthly dosing of risedronate at about 30 times the daily dose being effective for treatment of osteoporosis.  The prior art supplies a reason to believe that the regimen will be successful.  A person of ordinary skill would have reasonably believed that once-monthly dosing of risedronate would be effective based on the Riis, Delmas and Zegels studies, which demonstrated efficacy over intervals of a month and

01:12230196.1

15

longer.  Such a person would have had a reasonable belief that the regimen would be safe based on the references' teachings and the actual experience with larger doses—up to 160 mg weekly—of the related NCBP, alendronate.  (Yates Decl. ¶¶ 81–84, Exs. 21, 29, 30, 31, & 32.)  As the *Apotex* court stated:

> Arguments that the skilled artisan would not have been absolutely confident of success with a 150 mg once-monthly dose are fruitless, since the law requires only a reasonable expectation.

*Apotex* at *16.

### C.    The Differences Between The Prior Art and Claimed Invention

Taken as a whole, as it must be, *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983), the prior art discloses everything in the claimed invention.  *Lunar News* and Schofield disclose once-monthly dosing of risedronate for the treatment of osteoporosis, and they teach the motivation for that regimen—to foster long-term compliance and minimize side effects.  The prior art established the total dose concept, and Riis, Delmas and Zegels showed that NCBPs, including risedronate, could be effectively administered at proportionally higher doses with many-week intervals between administrations.  The patents in suit add nothing to the prior art—not even a single experiment to verify that what the inventors claimed was true.

Faced with the unequivocal disclosures of the prior art, plaintiffs denigrate it.  For example, plaintiffs have criticized *Lunar News* as not credible.  Plaintiffs are not the first patent owners to impugn that publication.  In attempting to defend its patent on a once-weekly alendronate regimen, Merck made the same argument against *Lunar News*'s earlier disclosure of once-weekly alendronate dosing.  Merck claimed that the publication did not overcome side effect concerns that Merck alleged would have deterred those skilled in the art.  In rejecting that argument, the Federal Circuit noted that Merck's patent provided no more information on that topic than did *Lunar News*.  The court also pointed out that Dr. Mazess, the author of *Lunar*

*News*, was "one of skill in the art," and that *Lunar News* was widely circulated. *Merck*, 395 F.3d at 1375–76. Here, as in *Merck*, the patents in suit provide no more information than *Lunar News*. In *Merck*, the court pointed out that no one had ever provided a reason "why Merck and not Dr. Mazess should get credit for the idea." *Id.* at 1375. Here, plaintiffs have never explained why they rather than Dr. Mazess should get credit for the idea of once-monthly dosing of risedronate, an idea that Dr. Mazess provided first.

### D. The Level of Skill in the Art was High

The parties do not dispute that the level of skill in the art was high in 2002. A person of ordinary skill in the art would have had a Ph.D. or M.D. degree and several years' experience with bone diseases, and would have been versed in the scientific literature. He or she would have been familiar with clinical studies related to bisphosphonates and would have had the ability to analyze and draw inferences from those studies. (Yates Decl. ¶ 13.) In *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007), the Court noted that a "person of ordinary skill is also a person of ordinary creativity, not an automaton." The "ordinary creativity" here would have been commensurate with the ordinary skill—at a high level. No extraordinary creativity would have been necessary to see the suggestions in *Lunar News* and elsewhere to administer risedronate at monthly intervals, to recognize that without exception the prior art references demonstrated the validity of the total dose concept, and to conclude that once-monthly administration of risedronate would likely succeed.

### E. Secondary Considerations Do Not Support the Patentability of Once-Monthly Risedronate

The Court should take into account "secondary considerations," both those that tend to support non-obviousness and those that tend to support obviousness.

1.    **The Near Simultaneous Invention of Once-Monthly Risedronate by Others is Evidence of Obviousness**

When an inventor devises the same solution to the problem at the same time as everyone else, such simultaneous or near simultaneous invention is strong evidence that the invention was in fact obvious. *Nat'l Steel Co., Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1337–38 (Fed. Cir. 2004) (such evidence demonstrates that others "would have considered it obvious to combine the [prior art] elements"); *In re Merck & Co.*, 800 F.2d 1091, 1098 (Fed. Cir. 1986); *see also Siemens-Elema AB v. Puritan-Bennett Corp.*, 13 U.S.P.Q.2d 1804, 1806 (S.D. Cal. 1989) ("Dr. Baker independently developed the [claimed invention], which indicates that the patent in suit was obvious to him"), *aff'd*, 925 F.2d 1480 (Fed. Cir. 1991).

**REDACTED**

In April 2002, also before the priority date of the patents in suit, Merck researchers filed U.S. Provisional Appl'n 60/370,501, which discloses in Example 5 a tablet formulation containing 280 mg alendronate for once-monthly dosing for treatment of osteoporosis. (Giunta Decl. Ex. 3.) This dose is four times the approved

**REDACTED**

weekly dose of 70 mg. It represents the same concept as the patents in suit applied to Merck's NCBP, alendronate.

**REDACTED**

### 2.  The "Commercial Success" of Once-Monthly Risedronate is Irrelevant

The patent owner bears the burden of coming forward with evidence of secondary considerations in its favor. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F. 3d 1348, 1360 (Fed. Cir. 2007). It is not clear which secondary considerations plaintiffs will proffer, but the most commonly asserted example is "commercial success."

Here, however, any alleged commercial success for once-monthly risedronate is irrelevant. Commercial success may be relevant to patentability because it indicates that economic incentives existed to make the invention. That despite these incentives no one made the invention may indicate that the invention was not obvious to them, and therefore that it would not have been obvious to a person skilled in the art. *Merck*, 395 F.3d at 1376–77. Here, however, at all relevant times the risedronate compound was and is covered by another patent that covers any risedronate dosing regimen, use, or formulation. *See Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989 (Fed. Cir. 2009) (upholding validity of U.S. Patent No. 5,583,122, which claims risedronate). Any incentive that persons skilled in the art would have otherwise had to develop a new dosage form of risedronate would have been blunted because they would have known they could not market the product in the face of P&G's compound

patent. **REDACTED**

Under such circumstances, commercial success is "not significantly probative." *Merck*, 395 F.3d at 1376–77 (commercial success of once-weekly Fosamax® not probative because of pre-existing Merck patent that covered alendronate). *See also Apotex* at *17–18 (commercial success of once-monthly ibandronate irrelevant to patents in suit because of Roche's blocking patent on ibandronate). For this reason, any commercial success that plaintiffs might assert is not probative on the issue of obviousness.

## CONCLUSION

In *Merck*, the Federal Circuit held that claims to the use of once-weekly administration of alendronate were invalid as obvious in view of a statement in *Lunar News* in 1996 that taught the concept. Here, another statement in a later issue of *Lunar News* describes the claimed invention of once-monthly dosing of risedronate. In addition, however, by 2002, the relevant date here, the art had vastly advanced so that it backed up the statement with hard science. If once-weekly administration of alendronate would have been obvious in 1996, then once-monthly risedronate would have been obvious in 2002. Just as the courts did in *Merck* and *Apotex*, this Court should hold invalid all the asserted claims.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

June 22, 2012

Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Pilar G. Kraman (No. 5199) [pkraman@ycst.com]
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

*Filed on Behalf of All Defendants*

01:12230196.1

20

OF COUNSEL:
James Galbraith
Maria Luisa Palmese
Antony Pfeffer
Peter L. Giunta
Vincent J. Rubino
**KENYON & KENYON LLP**
One Broadway
New York, NY  10004
(212) 425-7200

01:12230196.1

21

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on June 29, 2012, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF (which will send notification that such filing is available for viewing and downloading to all registered counsel), and in addition caused true and correct copies of the foregoing document to be served upon the following counsel of record in the manner indicated:

*By E-Mail*:

Frederick L. Cottrell, III  [cottrell@rlf.com]
Steven J. Fineman  [sfineman@rlf.com]
Jaclyn C. Levy [levy@rlf.com]
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
Wilmington, DE  19801
  *Counsel for Plaintiffs*

William F. Lee [william.lee@wilmerhale.com]
Hollie L. Baker [hollie.baker@wilmerhale.com]
Vinita Ferrera [vinita.ferrera@wilmerhale.com]
Allen C. Nunnally  [Allen.Nunnally@wilmerhale.com]
Christopher R. Noyes [christopher.noyes@wilmerhale.com]
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA  02109
  *Counsel for Plaintiff Warner Chilcott Company LLC*

David B. Bassett [david.bassett@wilmerhale.com]
**WILMER CUTLER PICKERING HALE AND DORR LLP**
399 Park Avenue
New York, NY  10022
   *Counsel for Plaintiff Warner Chilcott Company LLC*

Mark E. Waddell [mwaddell@loeb.com]
Joshua H. Harris [jharris@loeb.com]
**LOEB & LOEB LLP**
345 Park Avenue
New York, NY 10154
  *Counsel for Plaintiff Hoffman-La Roche Inc.*

**Error!**

Richard L. Horwitz [rhorwitz@potteranderson.com]
David E. Moore [dmoore@potteranderson.com]
**POTTER ANDERSON & CORROON LLP**
6th Floor, Hercules Plaza
1313 N. Market Street
P.O. Box. 951
Wilmington, DE 19801
 *Counsel for Defendants Apotex, Inc. and Apotex Corp.*

Steven E. Feldman  [steven.feldman@huschblackwell.com]
Hartwell P. Morse, III  [hartwell.morse@huschblackwell.com]
Louise T. Walsh  [louise.walsh@huschblackell.com]
Sherry L. Rollo [sherry.rollo@huschblackwell.com]
Philip D. Segrest, Jr. [Philip.Segrest@huschblackwell.com]
**HUSCH BLACKWELL SANDERS WELSH & KATZ LLP**
120 South Riverside Plaza, 22nd Floor
Chicago, IL  60606
 *Counsel for Defendants Apotex, Inc. and Apotex Corp.*

John C. Phillips, Jr.  [jcp@pgslaw.com]
Megan C. Haney  [mch@pgslaw.com]
**PHILLIPS, GOLDMAN & SPENCE, P.A.**
1200 North Broom Street
Wilmington, DE  19806
 *Counsel for Defendant Sun Pharma Global, Inc.*

Eric C. Cohen  [eric.cohen@kattenlaw.com]
Jeremy C. Daniel  [jeremy.daniel@kattenlaw.com]
**KATTEN MUCHIN ROSENMAN LLP**
525 West Monroe Street
Chicago, IL 60661-3693
 *Counsel for Defendant Sun Pharma Global, Inc.*

Richard K. Herrmann  [rherrmann@morrisjames.com]
Mary B. Matterer  [mmatterer@morrisjames.com]
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
 *Counsel for Defendant Mylan Pharmaceuticals, Inc.*

Edgar H. Haug  [EHaug@flhlaw.com]
Robert E. Colletti [RColletti@flhlaw.com]
Richard E. Parke [RParke@flhlaw.com]
**FROMMER LAWRENCE & HAUG LLP**
745 Fifth Avenue
New York, NY 10151 USA
 *Counsel for Defendant Mylan Pharmaceuticals, Inc.*

**Error!**

2

/s/ Karen L. Pascale

Karen L. Pascale (No. 2903) [kpascale@ycst.com]
**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  302-571-6600

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

**Error!**

3